## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| The Pfanenstiel Company, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER ON CROSS MOTIONS** |
| | ) | **FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | Case No.1:24-cv-212 |
| Hunt Oil Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Before the Court is the Defendant's motion for summary judgment filed on October 3, 2025, and the Plaintiff's motion for summary judgment filed on November 10, 2025. <u>See</u> Doc. Nos. 26 and 35. The motions have been fully briefed. <u>See</u> Doc. Nos. 27, 35-1, 37, 38, 41, and 44. For the reasons set forth below, the Defendant's motion is granted and the Plaintiff's motion is denied.

## I.    <u>BACKGROUND</u>

### A.    <u>FACTUAL BACKGROUND</u>

This case arises from disputes between The Pfanenstiel Company, LLC ("Pfanenstiel") and Hunt Oil Company ("Hunt") regarding oil and gas operating and production costs and subsequent revenues. Pfanenstiel is a limited liability company. All members of Pfanenstiel are citizens of Oklahoma. Hunt is a Delaware corporation with its principal place of business in Texas. Hunt operates oil and gas wells within Dunn County, North Dakota, and Divide County, North Dakota. Hunt operates the following oil and gas wells: Halliday 145-93-15-22H-3; Halliday 145-93-15-22H-4; Halliday 145-93-15-22H-5; Halliday 145-93-15-22H-6; Quill 145-93-10-3H-3; Quill 145-93-10-3H-4; Quill 145-93-10-3H-5; Quill 145-93-10-3H-6; Halliday 146-92-19-18H-3; Halliday

146-92-19-18H-4; Halliday 146-92-19-18H-5; Halliday 146-92-19-18H-6; Alexandria 161-100-24-13H-1; Alexandria 161-100-24-13H-3; Alexandria 161-100-24-13H-4; and Alexandria 161-100-24-13H-5 ("the disputed wells"). The disputed wells are located within spacing units established and pooled by the North Dakota Industrial Commission ("NDIC"). Pfanenstiel owns a working interest in each of the disputed wells.

As the operator of the wells, Hunt sent Pfanenstiel several well proposals for the disputed wells. The well proposals relevant to this action were sent between 2018 and 2022. The well proposals directed Pfanenstiel to indicate whether it "elected to participate" or "elected not to participate" and to return the well proposal to Hunt. Each well proposal included an authorization for expenditure ("AFE") with Pfanenstiel's proportionate share of costs. Although the exact language of the well proposals varied, the well proposals all included language that required Pfanenstiel to pay its proportionate share of operating costs with the election form it returned to Hunt. Pfanenstiel responded to the well proposals by stating it elected to participate in the drilling and operation of the wells. Pfanenstiel did not timely pay its share of operating costs on the disputed wells.

According to Pfanenstiel, its decision to elect to participate and its subsequent failure to pay its share of operating costs arose from its relationship with Independent Bank ("the bank"), which is a credit facility. Pursuant to a settlement agreement resulting from litigation in Texas in 2016, all of Pfanenstiel's cash was placed into a collateral account that was subject to the control of Independent Bank. The agreement prevented Independent Bank from accelerating on Pfanenstiel's debt. In 2018, Independent Bank directed Pfanenstiel to elect to participate in the Halliday 146 wells in an effort to preserve Pfanenstiel's asset value for an anticipated sale of the company. However, the bank did not pay the well costs Hunt invoiced through the collateral

account or through any further extensions of credit. According to Pfanenstiel, the bank permitted only that Pfanenstiel's revenues from any Hunt-operated wells be applied against Pfanenstiel's costs. On November 15, 2021, Pfanenstiel and Independent Bank entered into a forbearance agreement. The agreement gave the bank control over production proceeds and accounts payable, required the bank's approval for any participation elections, and imposed obligations on Pfanenstiel to market and sell its assets. Pursuant to the bank's directives, Pfanenstiel elected to participate in the Halliday, Quill, and Alexandria wells with the intention of paying well expenses through the disposition of Pfanenstiel's properties. Pfanenstiel alleges that the bank then utilized Pfanenstiel's cash flow to pay down debt, which prohibited Pfanenstiel from selling its portfolio.

After receiving Pfanenstiel's election without payment, Hunt sent Pfanenstiel a joint interest billing for the disputed wells. Pfanenstiel did not tender payment in response. As a result, Hunt paid Pfanenstiel's share of operating costs for the disputed wells. After repeated efforts to obtain payment from Pfanenstiel, Hunt notified Pfanenstiel that it would be deemed a non-consent owner (in other words, a nonparticipating owner), and that Hunt intended to recover a risk penalty from Pfanenstiel's interests.

Thereafter, Pfanenstiel returned or failed to cash several royalty checks and working interest revenue checks Hunt issued for wells unrelated to this dispute. Hunt deemed the returned or voided checks to be payment by Pfanenstiel toward its risk penalty for the disputed wells. The checks totaled $182,731.32. According to Hunt, Pfanenstiel's total share of costs for the disputed wells (not including a risk penalty) is approximately $14,341,795 as of February 28, 2025.

### B.    __NDIC PROCEEDINGS__

On July 19, 2019, Hunt filed an application with the NDIC requesting it issue an order 1) confirming the non-consenting owner status of Pfanenstiel due to its inability to pay its share of the costs in the disputed wells; 2) authorizing Hunt to recover costs and expenses accruing to Pfanenstiel; and 3) authorizing Hunt to recover a risk penalty from Pfanenstiel under Section 38-08-08 of the North Dakota Century Code. Pfanenstiel answered and moved to dismiss Hunt's application. Hunt moved for summary judgment. On October 22, 2019, the NDIC issued an order dismissing Hunt's application for lack of jurisdiction. The NDIC concluded it did not have jurisdiction to determine contractual issues and thus could not determine the validity of the elections in the well proposal.

### C.    __PROCEDURAL BACKGROUND__

On October 18, 2024, Pfanenstiel initiated this action. See Doc. No. 1. Pfanenstiel brings a declaratory judgment claim requesting the Court declare that it is a participating owner in the disputed wells and is not subject to risk penalties under N.D.C.C. § 38-08-08(3). Pfanenstiel also requests the Court order Hunt to provide a detailed monthly accounting of all costs and revenues for each of the disputed wells and enter a money judgment in favor of Pfanenstiel to the extent its revenues associated from the wells exceed its share of the well costs. Pfanenstiel also brings a breach of contract and a conversion claim against Hunt. On October 3, 2025, Hunt moved for summary judgment. See Doc. No. 26. Pfannenstiel filed a cross motion for summary judgment on November 10, 2025. See Doc. No. 35. On December 10, 2025, XTO Energy Inc. and Continental Resources, Inc. filed an amicus curiae brief in support of Hunt's motion for summary judgment.

See Doc. No. 41. The motions for summary judgment have been fully briefed and are ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1). The Court must consider the substantive standard of proof when ruling on a motion for summary judgment.  Anderson, 477 U.S. at 252. If the record taken as a whole and viewed in a light most

favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate. <u>Matsushita</u>, 475 U.S. at 587.

### III.    <u>LEGAL DISCUSSION</u>

The factual background of this case is far from clear. For instance, the dates Hunt sent the well proposals to Pfanenstiel range from October 15, 2018, to September 14, 2022. Yet, the NDIC order that Pfanenstiel argues has preclusive effect on its status as a participating owner was issued on July 19, 2019, which was a few years before Pfanenstiel received some of the well proposals. Additionally, payments made by Pfanenstiel are also disputed. Hunt asserts Pfanenstiel did not make any payments toward operating costs, whereas Pfanenstiel asserts it paid $954,467 toward the Halliday 146 wells. Pfanenstiel does not clarify when the alleged payments occurred. However, it is undisputed that Pfanenstiel did not make the payment when it sent the signed well proposal to Hunt, nor did it make the payment in a timely matter, according to its own admissions. Further, it is not clear whether the payments were actually payments Pfanenstiel made to Hunt or whether the payments were the returned or voided checks that Pfanenstiel deemed to be payments. Nevertheless, the parties both ask the Court to resolve this matter on summary judgment and agree there are no genuine issues of material fact. While there is ambiguity in the record, there are no genuine issues of material fact pertaining to the issues in this motion.

### A.    <u>BREACH OF CONTRACT CLAIM</u>

Pfanenstiel brings a breach of contract claim against Hunt. Pfanenstiel contends that Hunt's well proposals and Pfanenstiel's elections to participate constitute contracts for Pfanenstiel to pay

Hunt its share of the well costs and for Hunt to pay Pfanenstiel its share of the well revenues. In the complaint, Pfanenstiel alleges that after the revenue from the disputed wells were sufficient to cover their costs, Hunt had a duty to pay Pfanenstiel its share of revenues subject only to ongoing costs of operation. According to Pfanenstiel, Hunt breached the contracts by its failure to pay Pfanenstiel its share of revenues. Hunt disagrees that the well proposals constitute contracts, but assumes they do for the purposes of the present summary judgment motions.

        a.        **<u>Relevant Contractual Language</u>**

As alleged in the complaint, Pfanenstiel's obligation under the well proposals was to "pay its share of the wells' costs." <u>See</u> Doc. No. 1, p, 6. The Halliday 145 well proposal Hunt sent to Pfanenstiel stated,

> If your decision is to <u>elect to participate</u>, please also forward to [Hunt] with the AFE your proportionate share of the costs for the [Halliday 145 Wells]
>
> …
>
> If your decision is to <u>elect to participate</u>, and you subsequently fail to pay your proportionate share of the costs for the operations set forth herein within a reasonable period of time, [Hunt] may at its option, elect to deem you as having elected to not participate in such operations and impose a risk penalty as provided by North Dakota law.

<u>See</u> Doc. No. 28-1, p. 2. Pfanenstiel responded to the well proposal by letter, stating in relevant part, "please be advised that [Pfanenstiel] elects to accept your well proposal and further elects to participate in the drilling, completing, and equipping of the proposed well." <u>See</u> Doc. No. 28-2, p. 1. The Quill well proposals (Doc. No. 28-3) included identical language as the Halliday 145 well proposal, and Pfanenstiel responded (Doc. No. 28-4) with the identical language as the Halliday 145 response. Pfanenstiel did not send a payment with its response to Hunt.

The Halliday 146 well proposal included the following language: "If your decision is to <u>elect to participate</u>, please also forward to [Hunt] with the AFE your proportionate share of the

costs for the [Halliday 146 Wells]." <u>See</u> Doc. No. 28-5, p. 2. Pfanenstiel responded by sending the document back with a checkmark placed next to the statement that Pfanenstiel "elects <u>to participate</u> in the operations for the [Halliday 146 Wells]." <u>See</u> Doc. No. 28-6, p. 2. Pfanenstiel did not send a payment with the signed well proposal it returned it Hunt.

The Alexandria well proposals contained similar language. <u>See</u> Doc. No. 28-7, p. 7-8. Pfanenstiel responded by placing a checkmark next to the statement that it "elects <u>to participate</u> in the operations for the [Alexandira Wells]." <u>See</u> Doc. No. 28-8, p. 22. However, Pfanenstiel struck language from the Alexandria well proposals in several places, including the following statement:

> Please include with the signed election and AFE your proportionate share of the estimated cost. If you <u>elect to participate</u> and subsequently fail to pay your proportionate share of the costs for the operations set forth herein within a reasonable period of time, [Hunt] may, at its option, elect to deem you as having elected to not participate and impose a risk penalty as provided by North Dakota law.

<u>Id.</u> Initials were placed near the language that Pfanenstiel crossed out. Pfanenstiel did not include a  payment when it sent Hunt the signed election.

### b.   <u>Breach of Contract</u>

The well proposals obligated Pfanenstiel to pay its proportionate share of well operations if it elected to participate. Pfanenstiel did not fulfill this obligation. Pfanenstiel readily admits in its complaint that it "was unable to timely pay its share of drilling and completion costs." <u>See</u> Doc. No. 1, p. 3. Pfanenstiel further acknowledges that despite Independent Bank directing it to elect to participate, the bank "did not, however, pay the well costs invoiced by Hunt through the collateral account or through any further extensions of credit. Instead, [the bank] permitted only that Pfanenstiel's revenues from any Hunt-operated wells be applied against Pfanenstiel's costs." <u>See</u> Doc. No. 35-1, p. 11. Interestingly, Pfanenstiel points out in both its complaint and briefs that "Hunt's remedy against Pfanenstiel for nonpayment of well expenses is through a breach of

contract action" (See Doc. No. 1, p. 5) thereby acknowledging its own breach. Despite Pfanenstiel's own failure to fulfill its obligation, Pfanenstiel alleges Hunt breached the contracts by failing to pay Pfanenstiel its share of revenue subject only to ongoing costs of operations. Hunt argues that it had no such obligation under the contracts and even if it did, it was excused from performing under the contract.

Hunt argues that the contracts did not impose an obligation on Hunt to pay Pfanenstiel its share of revenue subject only to ongoing costs of operations as alleged in the complaint. Pfanenstiel does not refer the Court to any provision of any of the well proposals where Hunt agreed to pay Pfanenstiel its share of revenues subject only to ongoing costs of operation. Accordingly, Hunt did not have a duty under the contracts to pay Pfanenstiel its share of revenues. Therefore, Hunt did not breach any of the contracts by failing to pay Pfanenstiel its share of revenues.

Additionally, Hunt is excused from performing under the contracts due to a lack of consideration in the Alexandria well contract and a failure of consideration in the Halliday 145, Halliday 146, and Quill well contracts. First, the Court addresses the well proposal pertaining to the Alexandria wells. In the Alexandria well proposal, Pfanenstiel crossed out the pertinent language that required it to include its proportionate share of the estimated cost with the signed election. Section 9-01-02(4) requires sufficient consideration for a contract to exist. See also Irish Oil & Gas, Inc. v. Riemer, 2011 ND 22, ¶ 16 794 N.W.2d 715 (when no consideration exists, the lack of consideration results in no contract being formed.) Pfanenstiel removed the consideration from the well proposal when it struck the language requiring it to pay its proportionate share of the estimated costs. No contract existed between Hunt and Pfanenstiel as to the Alexandria wells because it lacked consideration. Accordingly, Hunt could not have breached the contract because no contract existed.

Next, the Court addresses the well proposals pertaining to the Halliday 145, Halliday 146, and Quill wells. Hunt argues it is excused from performing under the contracts due to a failure of consideration. Under North Dakota law, "[f]ailure of consideration arises when a valid contract has been formed, but the performance bargained for has not been rendered." Hartman v. Grager, 2021 ND 160, ¶ 43, 964 N.W.2d 482. "A total failure of consideration will occur where a party has failed to perform a substantial part of its obligation, so as to defeat the very object of the agreement." Irish Oil & Gas, Inc. v. Riemer, 2011 ND 22, ¶ 20, 794 N.W.2d 71. In *First Nat. Bank of Belfield v. Burich*, the North Dakota Supreme Court distinguished a total failure of consideration from a partial failure of consideration. 367 N.W.2d 148 (N.D. 1985).

> A total failure of consideration excuses the nonbreaching party from its own duty to perform under the contract. On the other hand, there is a partial failure of consideration when the failure to perform is insubstantial, so that sufficient consideration remains to sustain the contract. Consequently, with a partial failure of consideration the nonbreaching party is not excused from performance but rather is entitled to an award of damages.

Id. at 152-53.

In this case, the consideration is Pfanenstiel's payment for its share of operations, which was required when it sent the signed contract to Hunt. Pfanenstiel did not pay its share. As noted above, Pfanenstiel acknowledged that Hunt could bring a breach of contract claim for Pfanenstiel's nonpayment. Hunt argues Pfanenstiel's failure to make the payments constitutes a total failure of consideration and it is therefore excused from performing under the contracts. In response, Pfanenstiel alleges Hunt received consideration in the form of revenue from Pfanenstiel's property interests and payments Pfanenstiel made separately. Specifically, Pfanenstiel argues that the $954,467 it made in payments for its share of the Halliday 146 wells constitutes consideration.[1] It

---

[1] The parties appear to dispute the amount of Pfanenstiel's payments. Although the payments are a factual dispute, there are not a genuine issue of material fact because the payments do not constitute valid consideration for the contracts regardless of the amount that was paid.

10

is unclear when these alleged payments were made, but the payments were undisputedly untimely and cannot constitute the consideration that was required at the time of election. By the time the payments were made, Hunt was already excused from any required performance under the contract due to Pfanenstiel's lack of consideration. Further, even if the payments were timely, a total failure of consideration occurred because the payments were not sufficient consideration. Of the $954,467 payments Pfanenstiel allegedly made, $771,736 constituted Hunt's recovery of Pfanenstiel's share of production. Hunt argues that, at most, Pfanenstiel made $182,731 in payments toward the Halliday 146 wells. This payment constitutes approximately 4.8% of the $3,883,389 that Pfanenstiel owed for its share of operating costs for the Halliday 146 wells. Pfanenstiel's failure to perform over 95% of the required payment clearly constitutes a failure to perform a substantial part of its obligation, which equates to a total failure of consideration. Additionally, the alleged payments only apply to the contracts pertaining to the Halliday 146 wells. Pfanenstiel fails to explain how payments made regarding the Halliday 146 wells are relevant to any of the other well proposals.

Under North Dakota law, "[g]enerally, determination of whether there has been a failure of consideration is a question of fact. Only when the evidence is such that reasoning minds could draw but one conclusion does the fact question become a question of law for which summary judgment may be appropriate." Irish Oil & Gas, Inc. v. Riemer, 2011 ND 22, ¶ 23, 794 N.W.2d 715. Here, it is undisputed that Pfanenstiel did not include its proportionate share of costs with its signed elections on any of the well proposals. Pfanenstiel even admits it was unable to timely pay its share of drilling and completion costs in its complaint. The Court concludes reasoning minds could not differ that Pfanenstiel's failure to include its share of proportionate well costs with the

signed election or within a reasonable time after sending Hunt the signed election constitutes a failure of consideration.

The Court concludes as a matter of law that a total failure of consideration occurred when Pfanenstiel failed to provide the payment for its proportionate share of the cost with its signed election. The total failure of consideration excused Hunt from any required performance. Therefore, the Court concludes Hunt did not breach the contract. Summary judgment is granted in favor of Hunt as to the breach of contract claim.

## B.    DECLARATORY JUDGMENT

Pfanenstiel requests the Court enter a judgment declaring that it is a participating owner in the disputed wells and is not subject to risk penalties under N.D.C.C. § 38-08-08(3). Pfanenstiel also requests the Court order Hunt to provide a detailed monthly accounting of all costs and revenues for each of the disputed wells and enter a money judgment in favor of Pfanenstiel to the extent its revenues associated from the wells exceed its share of the disputed wells' costs.

Section 38-08-08(3) of the North Dakota Century Code provides in relevant part:

> if the owner of an interest in a spacing unit elects not to participate in the risk and cost of drilling a well thereon, the owner paying for the nonparticipating owner's share of the drilling and operation of a well may recover from the nonparticipating owner a risk penalty for the risk involved in drilling the well.

The parties dispute whether Pfanenstiel is a nonparticipating owner under N.D.C.C. § 38-08-08(3), which determines whether Hunt can recover a risk penalty related to the wells.

### a.    NDIC Order

Pfanenstiel maintains that the NDIC already determined that it is a participating owner in its October 22, 2019 order. Pfanenstiel argues that under the doctrines of res judicata and/or collateral estoppel, preclusive effect should be given to the NDIC order. Further, Pfanenstiel argues

that the Court must give deference to the NDIC order. Hunt argues that the NDIC's order has no

effect on Pfanenstiel's current claims because the NDIC dismissed Hunt's application for lack of

jurisdiction and any dicta or language in the dismissal is irrelevant to this case. This Court agrees

with Hunt that the NDIC's order does not affect Pfanenstiel's claims in the way Pfanenstiel

suggests.

The NDIC did not determine whether Pfanenstiel was a participating owner, nor did it have

jurisdiction to do so. In its order, the NDIC stated, "the Commission finds that this case does not

present a dispute within the jurisdiction of the Commission. Therefore, this application should be

dismissed." See Doc. No. 35-14, p. 3. In the order, the NDIC discussed Pfanenstiel's status as a

participating owner as follows:

> A 'non-participating owner' has routinely been found by the Commission to be an
> owner that fails to respond to the invitation as required by the rule (well proposal)
> or responds to an invitation (well proposal) electing to not participate. See NDIC
> Order No. 15935 and NDIC Order No. 16107. Contrary to a 'non-participating
> owner', a 'participating owner' is one that responds to the invitation within the
> required period of time electing to participate. As Pfanenstiel executed the election
> to participate within the required time period, Pfanenstiel would be considered a
> participating owner unless the validity of the election to participate was found to be
> invalid.

Id. at 3. The NDIC did not find that Pfanenstiel was a participating owner, as Pfanenstiel suggests.

Rather, the NDIC found that Pfanenstiel's status as a participating owner is dependent on the

validity of the election, which is governed by the well proposals. The NDIC determined it did not

have jurisdiction to determine the validity of the election and did not rule on the merits. The NDIC

explained that it "does not have jurisdiction to determine whether or not the election is invalid due

to non-payment of invoices. The implications of Pfanenstiel's payment or non-payment of invoices

on the validity of the election is a contractual determination and must be determined by the District

Court." Id. at p. 4. Further, even if the NDIC did rule on the merits, the ruling would be void

because it lacked jurisdiction. Therefore, the Court finds that any conclusions the NDIC made as to Pfanenstiel's status as a participating owner does not have preclusive effect and is not entitled to deference as the NDIC lacked jurisdiction over the application. See Sturdevant v. SAE Warehouse, Inc., 270 N.W.2d 794 (N.D. 1978) (concluding that decisions made by a court without subject matter jurisdiction are void).

### b.    Risk Penalties Under N.D.C.C. § 38-08-08(3)

Pfanenstiel argues that it elected to participate by checking the box on the well proposals indicating it "elects to participate in the operations" of the wells, which precludes Hunt from recovering a risk penalty under N.D.C.C. § 38-08-08(3). Hunt argues that Section 38-08-08(3) requires an owner to 1) elect to participate and 2) participate by paying its share of the drilling and operating costs. Hunt contends that Pfanenstiel's checkmark next to the box stating it elected to participate is insufficient to determine it is a participating owner because Pfanenstiel failed to pay its share of well costs. Hunt maintains it is entitled to a risk penalty under Section 38-08-08(3) because Pfanenstiel is a nonparticipating owner and Hunt paid Pfanenstiel's share of drilling and operation of the wells.

Although the parties dispute what constitutes an election, both parties agree that an election to participate is required under N.D.C.C. § 38-08-08(3). In this case, Pfanenstiel's elections are governed by the well proposals. As discussed above, the election in the well proposals required Pfanenstiel to pay its share of operating costs, which it failed to do. Pfanenstiel's election to participate was not valid because it failed to pay the operating costs as required by the well proposals. As the NDIC noted in its order, "Pfanenstiel would be considered a participating owner unless the validity of the election to participate was found to be invalid." See Doc. No. 35-14, p.

3. Accordingly, Pfanenstiel is a nonparticipating owner that did not elect to participate for the purposes of N.D.C.C. § 38-08-08(3).

Pfanenstiel argues that even if a failure of consideration occurred as to the contract, its elections to participate are still valid. The Court disagrees. The election to participate and the requirement for Pfanenstiel to pay its share of operating costs are intertwined. The well proposals required the payment as a part of the election. Accordingly, without the required payment, the election is not valid under the Halliday 145, Halliday 146 and Quill well proposals. As to the Alexandria wells, the Court concluded no contract existed because of a lack of consideration. An election made within an invalid contract is clearly not a valid election.

The parties focus their arguments regarding the declaratory judgment claim on the statutory construction of N.D.C.C. § 38-08-08(3) and legislative intent. The Court need not delve into such an analysis because an election is undisputably required under the statute and the Court finds that no valid election occurred under the well proposals. Because there was no valid election, Pfanenstiel cannot be considered a participating owner under N.D.C.C. § 38-08-08(3).

Finally, as to the Halliday 145 and Quill wells, regardless of any failure of consideration or the requirements under N.D.C.C. § 38-08-08(3), Pfanenstiel agreed that Hunt has the discretion to deem Pfanenstiel "as having elected to not participate in such operations and impose a risk penalty as provided by North Dakota law" if Pfanenstiel elects to participate but fails to pay its proportionate share of costs for operations within a reasonable period of time. Pfanenstiel admitted it did not timely pay its share of costs. Accordingly, the terms of the contract unequivocally allow Hunt to impose a risk penalty and deem Pfanenstiel as a nonparticipating owner in the Halliday 145 and Quill wells.

The undisputed facts in this case show that Pfanenstiel is a nonparticipating owner as a matter of law. Therefore, the Court grants Hunt's motion for summary judgment as to Pfanenstiel's declaratory judgment claim. Pfanenstiel's motion for summary judgment is denied.

### C. <u>CONVERSION</u>

Pfanenstiel alleges that Hunt's failure to pay Pfanenstiel its share of oil and gas revenue from the disputed wells constitutes conversion. Under North Dakota law, conversion is the "tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." <u>Nelson v. Mattson</u>, 2018 ND 99, ¶ 24, 910 N.W.2d 171. "Conversion requires an intent to exercise control or interfere with the use of property to such a degree as to require a forced sale of the plaintiff's interest in the goods to the defendant." <u>Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.</u>, 2004 ND 117, ¶ 11, 680 N.W.2d 634. "The gist of conversion is not in acquiring the complainant's property, but in wrongfully depriving the complainant of the property." <u>Id.</u> A conversion claim "requires the plaintiff prove the defendant had an intent to deprive the plaintiff of the property." <u>McColl Farms, LLC v. Pflaum</u>, 2013 ND 169, ¶ 20, 837 N.W.2d 359.

Pfanenstiel does not dispute that Hunt held the right to sell Pfanenstiel's share of production and apply the revenue against Pfanenstiel's costs until fully paid. Pfanenstiel argues that Hunt's decision to retain Pfanenstiel's proceeds after costs were recouped was a wrongful exercise of dominion over Pfanenstiel's share of production from the wells. The Court's findings above resolve this issue. Pfanenstiel was not entitled to the money it claims was converted. As explained above, Hunt is entitled to recover a risk penalty from Pfanenstiel, and no contract exists between Hunt and Pfanenstiel to the contrary.

IV.     **CONCLUSION**

The Court has carefully reviewed the entire record, the parties' briefs, and relevant case law.  For the reasons set forth above, the Defendant's motion for summary judgment (Doc. No. 26) is **GRANTED**. The Plaintiff's motion for summary judgment (Doc. No. 35) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 23rd day of February, 2026.

/s/  Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court